IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTTSDALE INDEMNITY CO., *et al.* | )<br>)<br>) |
| Plaintiff, | ) Case No. 09 C 4472 |
| v. | )<br>) Judge Virginia M. Kendall |
| VILLAGE OF CRESTWOOD, *et al.* | )<br>) |
| Defendant. | )<br>) |

**MEMORANDUM OPINION AND ORDER**

Scottsdale Indemnity Company ("Scottsdale") and National Casualty Company ("National") (together, "the Insurers") sued the Village of Crestwood, Illinois ("the Village") its former mayor Chester Stranczek, its current mayor Robert Stranczek, and its former water operator Frank Scaccia (together with the Village, "the Crestwood Defendants"), a number of individual defendants allegedly harmed by the Crestwood Defendants' conduct (collectively, "the Earley Defendants") and the Attorney General of the State of Illinois ("the Attorney General") seeking a declaration that, under various insurance policies, the Insurers owe no defense or indemnity to the Crestwood Defendants in over two dozen underlying lawsuits. Except Saccia, the Crestwood Defendants brought a counterclaim against the Insurers, alleging that they are in entitled to a defense and indemnity, and that the Insurers breached the policies at issue. The Crestwood Defendants also seek their attorneys' fees and damages under Section 155 of the Illinois Insurance Code.

This coverage dispute arises out of allegations that the Crestwood Defendants delivered contaminated tap water to Village residents. Specifically, the underlying complaints allege that in or around 1986, the State of Illinois informed the Village that one of the tap water wells it owned

was contaminated with perchloroethylene ("PCE"), which breaks down into the chemicals vinyl choride and dichloroethylene ("DCE"). Some of the underlying complaints allege that the contamination came from a dry cleaner near the well. The underlying complaints further allege that the contamination in the water caused, and will continue to cause, death, cancer and other serious illnesses.

The Insurers and Crestwood Defendants filed cross motions for summary judgment on the issue of whether the Insurers have a duty to defend the Crestwood Defendants in the underlying suits. Specifically, the Insurers assert they have no duty to defend under various policy exclusions, including the "pollution exclusion." The Insurers also seek summary judgment on the counterclaims, arguing that if they have no duty to defend the Crestwood Defendants, they have no duty to indemnify, either, and they did not act "unreasonably or vexatiously" as a matter of law. The Crestwood Defendants contend that none of the exclusions apply and that the suits fall squarely within the policies at issue. The parties do not have material fact disputes. For the reasons detailed below, the Court grants the Insurers' motion for summary judgment, dismisses the Crestwood Defendants' counterclaim, and enters final judgment for the Insurers.

I. **FACTS**

   A. **The Underlying Complaints and Attorney General Action**

The underlying claimants have filed a series of over two dozen lawsuits in the Circuit Court of Cook County, Illinois against one or more of the Crestwood Defendants, among other parties. (*See* Docs. 1, 61, 93, 120, 183, and 212, Exs. A-G, I, FF-BBB; Pl. 56.1 Resp. ¶¶ 13-49, Def. 56.1 Resp. ¶¶ 11-50.) Some of the suits are brought on behalf of large classes of people, including all residents of the Village and everyone exposed to the allegedly contaminated water, while others are

individual suits for damages. Though the underlying complaints differ slightly in the claims brought and, in some instances, proposed class definitions, they uniformly allege a version of the following facts material to the Court's coverage determination. First, they allege that the State of Illinois told the Village in 1985 or 1986 that the well was contaminated, and the Village promised the state regulators that the Village would buy water from Lake Michigan, using the well only for emergency purposes. According to the complaints, however, the Village continued to use the contaminated water in a cost-cutting move, until federal regulators shut the well down for good in 2007. Finally, some of the complaints allege that a dry cleaning business contaminated the well with PCE, DCE, and vinyl chloride. The underlying complaints seek tort damages for health problems and even deaths caused by exposure to the contaminated water, and some also bring contract claims seeking a refund of the money paid for the water. Several of the complaints cite an April 2009 article in the Chicago Tribune reporting many of the common facts alleged in the underlying complaints. *See* Michael Hawthorne, *Crestwood Officials Cut Corners and Supplied Residents With Tainted Water for 2 Decades*, Chicago Tribune, April 19, 2009, at C1.

In addition, the Attorney General filed an enforcement action on behalf of the People of Illinois (Doc. 1, Ex. H) against the Crestwood Defendants in the Circuit Court of Cook County, making detailed allegations concerning the contaminated well and the Crestwood Defendants' knowledge of that contamination. Those allegations track the allegations made in the private suits. The Attorney General brings claims for filing false water quality reports with the State, for issuing false water quality reports to Village residents, for failing to test the well, for failing to supply safe water, and for other problems associated with the Village's tap water system. (*Id.*)

3

### B. Relevant Terms of the Insurance Policies at Issue

#### 1. Scottsdale's Primary Policies

Scottsdale issued to the Village a series of 11 single-year primary "Public Entity" policies between October 1, 1998 and October 1, 2009. (Def. 56.1 Resp. ¶ 51.) There is no dispute that the Village, the Stranczeks and Saccia are insureds under the policies. (Pl. Memo. at 5.) The 2008-2009 policy has the following coverage and exclusion:

> We will pay on behalf of the insured all sums which the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage,' 'personal injury,' 'advertising' or 'employee benefits injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for bodily injury,' 'property damage,' 'personal injury,' 'advertising' or 'employee benefits injury' to which this insurance does not apply.
>
> \*   \*   \*
>
> This Coverage Form does not apply to: . . .
>
> **Failure to Supply**
> 'Bodily injury' or 'property damage' arising out of the failure of any insured to adequately supply gas, oil, water, electricity or steam.

(Def. 56.1 Resp. ¶ 52.)[1] All 11 Scottsdale policies issued to the Village have the following "pollution exclusion":

> This policy does not apply to:
>
> 1.   Pollution
>
> (a) 'Bodily injury,' 'property damage,' or 'personal injury' arising out of or 'wrongful act(s)' which result in the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time.

---

[1] Thought the earlier Scottsdale and National policies have different language than the 2008-2009 policies, the parties agree that the differences are not relevant to the Court's coverage determination. (Pl. 56.1 Resp. ¶¶ 51, 58.)

4

* * *

(b) Any loss, cost or expense arising out of any:

> (1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or
>
> (2) 'Claim' or 'suit' by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste . . . .

(Def. 56.1 Resp. ¶¶ 53-54; Pl. 56.1 Resp. ¶ 55.)

2. <u>National's Excess and Umbrella Policies</u>

Between October 1, 1998 and October 1, 2009, National issued to the Village three single-year excess policies and eight umbrella policies. (Def. 56.1 Resp. ¶ 55.) The three excess policies, in effect between 1998 and 2001, follow the form of the Scottsdale primary policies issued the same years. (Def. 56.1 Resp. ¶ 56.) The 2008-2009 umbrella policy states in part:

> We will pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking damages for such 'bodily injury' or 'property damage' when the 'underlying insurance' does not provide coverage or the limits of the 'underlying insurance' have been exhausted . . . . [W]e will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply . . . .

* * *

This insurance does not apply to . . .

5

### i. **Pollution**

(1) 'Bodily injury' or 'property damage' which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time; or

(2) 'Pollution cost or expense.'

This exclusion does not apply if valid 'underlying insurance' for the pollution liability risks described above exists or would have existed but for the exhaustion of underlying limits for 'bodily injury' and 'property damage.' Coverage provided will follow the provisions, exclusions and limitations of the 'underlying insurance.'

(Pl. 56.1 Resp. ¶ 58.) The 2008-2009 policy defines pollutants and "pollution cost or expense" as:

'Pollutants' mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes acids, alkalis, chemicals and waste . . . .

'Pollution cost or expense' means any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, 'pollutants;' or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in nay way responding to, or assessing the effects of, 'pollutants.'

(Pl. 56.1 Resp. ¶ 58.)[2] Finally, the 2008-2009 National policy has the following exclusion:

This insurance does not apply to:

'Bodily injury,' or 'property damage' or 'personal and advertising injury' arising out of the failure of any 'insured to adequately supply gas, oil, water, electricity or steam.

(Pl. 56.1 Resp. ¶ 60.)

---

[2] A few of the National policies have the pollution exclusion in a slightly different form but those differences do not impact the Court's coverage analysis. (Pl. 56.l Resp. ¶ 63.) *See* footnote 1above.

## II. STANDARD OF REVIEW AND CHOICE OF LAW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the Court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

The parties agree the Court should apply Illinois law. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies."). Specifically, the Court will "apply the law that [it] believe[s] the Supreme Court of Illinois would apply if the case were before that tribunal rather than before this court." *Help at Home, Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 753 (7th

Cir. 2001). Under Illinois law, "[t]he construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1998).

## III. DISCUSSION

### A. The Duty to Defend Under Illinois Law

To determine if an insurer must defend its insured, the Court compares "the underlying complaint and the language of the insurance policy," resolving "[a]ny doubts as to whether particular claims fall within the policy . . . in favor of coverage." *Nat'l Cas. Co. v. McFatridge*, 604 F.3d 335, 338 (7th Cir. 2010) (applying Illinois law); *Am. States Ins.Co. v. Koloms*, 687 N.E.2d 72, 75 (Ill. 1997) (noting "[i]f the facts alleged in the complaint fall within, or potentially within, the language of the policy, the insurer's duty to defend arises"). An insurer may, however, "refuse to defend an action in which, from the face of the complaint, the allegations are clearly outside the bounds of the policy coverage." *McFatridge*, 604 F.3d at 338. In construing an insurance policy, "[a] court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks and involved, and the overall purpose of the contract." *Koloms*, 687 N.E. at 75 (internal citation omitted).

### B. The Pollution Exclusion Applies

The Insurers assert that the pollution exclusion in each policy at issue excuses their duty to defend the Crestwood Defendants in the underlying complaints and Attorney General action because those suits arise from "traditional environmental pollution," as that concept is defined by the Illinois Supreme Court in *Koloms*. The Crestwood and Earley Defendants argue that the underlying

8

complaints arise from the sale of a defective product, namely contaminated water, not "traditional environmental pollution."

### 1. Under *Koloms*, the Pollution Exclusion Only Applies to "Traditional Environmental Pollution"

In *Koloms*, the Illinois Supreme Court considered the scope of a pollution exclusion virtually identical to the ones at issue in this case. There, a furnace in a commercial building began to emit carbon monoxide and other noxious fumes. *Id.* at 74. Employees of the businesses in the building filed suit against the owner, alleging the owner negligently maintained the furnace. *Id.* The owner's insurer brought a declaratory judgment action asserting it did not have to defend the building owner, citing the pollution exclusion. *Id.* The carrier argued that the unambiguous and broad language of the pollution exclusion applied because the suit arose from the "release" of an "irritant or contaminant." *Id.* The building owner, on the other hand, asserted that even though the language of the pollution exclusion is unambiguous on its face, it was meant to apply to "large scale, environmental contamination"—its historical purpose—not "routine commercial hazards such as faulty heating and ventilation." *Id.* at 77-78. In other words, according to the building owner, the insurer should not have escaped its duty to defend because the risks for which the owner sought coverage happened to involve an irritant. *Id.*

Though it recognized a split in authority, the court found that the pollution exclusion's broad language could lead to absurd results, including providing no coverage if someone slipped on a bottle of Drano. *See id.* (citing *Pipefitters Welfare Ed. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992)). The court was "troubled by what we perceive to be an overbreath in the language of the exclusion as well as the manifestation of an ambiguity which results when the exclusion is applied to cases which have nothing to do with 'pollution' in the conventional, or

9

ordinary sense of the word." *Koloms*, 687 N.E. at 79. Tracing the history of the pollution exclusion as a term in standard-form commercial general liability ("CGL") policy, the court noted that an early iteration of it was inserted in the standard CGL policy in 1970 in the wake of amendments to the Clean Air Act and front page environmental disasters like Times Beach, Missouri (dioxin contamination), the Love Canal neighborhood of Niagra Falls, New York (buried toxic waste), and the wreck of the *Torrey Canyon* supertanker of the coast of England. *Id.* at 80 (recognizing that environmental legislation like the 1970 amendments to the Clean Air Act "imposed greater economic burdens on insurance underwriters.") The court found that the history of the exclusion demonstrates that its purpose was "avoidance of the enormous expense and exposure resulting from the explosion of *environmental* litigation." *Id.* at 81 (internal citation omitted, emphasis in original); *see also* Jeffrey Stempel, *The Insurance Policy as a Thing*, 44 Tort & Ins. L.J. 813 (Spring/Summer 2009) (noting "[v]iewed in historical context, it is quite clear that the CGL policy was designed to provide broad coverage for the types of general liability claims that were likely to confront commercial policyholders as a consequence of their normal operations" and describing cases like *Koloms* as "not involv[ing] long-running or wide-ranging pollution that raises the prospect that the insurer will be forced to pay for unduly coordinated risk," as instances like the one in *Koloms* are "run-of-the-mill mishap[s] that one knows can strike a business at any time."). Ultimately, the court sided with the building owner, finding the pollution exclusion applies "only to those injuries caused by traditional environmental pollution" and "should continue to be . . . the appropriate means of avoiding the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment*." *Id.* at 81 (emphasis in original, internal citation omitted).

### 2. The Underlying Complaints Arise From "Traditional Environmental Pollution"

Given the holding in *Koloms*, the question remaining for the Court, then, is whether the underlying suits are like the furnace leak in *Koloms*, namely, the type of isolated, run-of-the-mill result from day-to-day operations and properly covered, or whether they arise from "traditional environmental pollution." Though it may be more art than science to determine when the isolated consequences of normal business operations end and "traditional environmental pollution" begins, the instant case falls cleanly within the definition. Put simply, contamination of a water supply, the common genesis of all of the underlying complaints, is commonly understood as environmental pollution. *See Koloms*, 687 N.E. at 79 (discussing the "conventional, or ordinary sense" of the word pollution); *see e.g.,* 18 U.S.C. § 1251 (listing the goals of the Clean Water Act). Further, the underlying complaints allege that the Village spread this contamination to thousands of people for decades, causing serious injuries and even death. This widespread contamination is not simply a run-of-the-mill mishap that happens to involve a hazardous chemical, but exactly the type of "yawning" and potentially enormous environmental liability that *Koloms* explained is the purpose of the pollution exclusion. *See Koloms*, 687 N.E. at 81.

Other binding precedent agrees. Some of the complaints blame the contamination on a dry cleaning business located near the well. In *Kim v. State Farm Fire and Casualty Company*, 728 N.E.2d 530 (Ill. App. Ct. 2000), the court, citing *Kolmos*, found that a dry cleaner's release of toxic chemicals into the ground constituted "traditional environmental pollution" and was not covered under the pollution exclusion. *Id.* at 534-35. Similarly, in *Housing Authority Risk Retention Group,*

*Inc. v. Chicago Housing Authority*, 378 F.3d 596 (7th Cir. 2004)[3], the Seventh Circuit considered an class action complaint that alleged that the Chicago Housing Authority built a housing project on a site contaminated by toxic chemicals from nearby factories. *Id.* at 601. The court found "it is clear that the type of pollution alleged in the Underlying Litigation here does constitute 'traditional environmental contamination,' i.e., the 'gradual or repeated discharge of hazardous substances into the environment,' rather than contamination of the sort involved in *Koloms*." *Id.* at 606.

In addition to characterizing the underlying complaints as arising from the sale of a defective product, rather than arising from "traditional environmental pollution," the Crestwood Defendants assert three arguments that the pollution exclusion should not apply. First, the Crestwood Defendants, argue that the pollution exclusion is ambiguous "as a matter of law when applied to the facts of the water-related liability suits" and should be construed against the Insurers as drafted. (Def. Resp. at 7-10.) *Koloms* already answered the ambiguity question for this Court. In *Koloms*, the court conclusively interpreted the pollution exclusion to apply to instances of "traditional environmental pollution." *See Koloms*, 687 N.E. at 81. The question before this Court, then, cannot be whether the pollution exclusion is ambiguous, but rather whether the underlying complaints arise from "traditional environmental pollution."[4]

---

[3]In *Housing Authority*, the Seventh Circuit adopted the district court's reasoning as its own and attached the district court's opinion to its brief introductory opinion. *See Housing Authority*, 378 F.3d at 598. Consequently, despite the Crestwood Defendants' suggestion to the contrary, the district court's reasoning is binding on this Court just as if the opinion had been drafted by the Seventh Circuit.

[4]Despite the arguments from the Earley Defendants to the contrary, the wording of the pollution exclusions themselves are broad enough to cover the underlying complaint because they concern "dispersal" of contamination from a location (the well) owned by the Village. (*See, e.g.*, Doc. 1, Ex. X at SIC-NCC 1472.)

The Attorney General Action arises from the same well contamination as the private suits. For the same reasons, the Insurers owe no duty to defend that action. The Crestwood Defendants cite *U.S. Fidelity and Guaranty Co. v. Specialty Coating Co.*, 535 N.E.2d 1071 (Ill. App. Ct. 1989), where the court found the pollution exclusion ambiguous and required the carrier to defend the insured in an action brought by the Attorney General. *See id.* at 1078. *Specialty Coating* pre-dates *Koloms*, and found ambiguity in the pollution exclusion as it applied to a manufacturer who engaged

12

Second, the Crestwood Defendants try to distinguish *Kim* and *Housing Authority*, asserting those cases are inapposite because in those instances the insured was the polluter. (Def. Resp. 5-7.) In *Housing Authority*, the Seventh Circuit explicitly considered the question "whether the ... pollution exclusion bars coverage of all claims for pollution, whether or not the contaminants originated on the insured's property." *Housing Authority*, 378 F.3d at 604. Surveying the caselaw, including *Kim*, the court said yes: the "pollution exclusion bars coverage for bodily injuries resulting from exposure to pollution, regardless of origin." *Id.* at 606; *see also Kim*, 728 N.E.2d at 536 (noting "under *Koloms*, the dispositive determination is whether the release of the [chemical] constituted traditional environmental pollution . . . [s]ince the release of the [chemical] did constitute such traditional environmental pollution, the absolute pollution exclusion applies to bar coverage, regardless of the cause of the [chemical's] release.") Indeed, binding precedent aside, the Crestwood Defendants give no compelling reason why the coverage analysis should be different if the Village is not the original polluter.[5] The Earley Defendants, in a separate response brief, attempt to distinguish *Housing Authority* because there the CHA, the insured, "was alleged to have built an apartment complex directly on a toxic waste dump thus directly causing the pollution." (Earley Resp. at 5.) But building a housing project on the contaminated site did not *cause* the pollution, but rather *spread* it to the people that moved there. If the CHA had chosen a clean site, none of the

---

a waste hauler and in the "sudden and accidental" language of an older version of the standard pollution exclusion. *Id.* at 1076-78; *see also* footnote 5 below. *Specialty Coating* is factually distinct from the instant case and *Koloms* resolved the question of ambiguity in the same pollution exclusion at issue here.

[5]The Crestwood Defendants cite to *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 607 N.E.2d 1204, 1202 (Ill. 1992), which predates *Koloms*, *Kim* and *Housing Authority*, for the proposition that "the pollution exclusion applies to the cause of pollution, not the resulting damage." *Outboard Marine* does not support that general proposition. Outboard Marine's discussion of the pollution exclusion centered on the interpretation of the term "sudden and accidental" that appeared in an earlier iteration of the standard form pollution exclusion. *Id.* at 118-125; *see also Koloms*, 687 N.E. at 80-81 (discussing how courts in the 1970s and early 1980s "labored over the exact meaning of the words 'sudden and accidental'" and citing *Outboard Marine*).

13

underlying plaintiffs would have been harmed. The instant case is no different. Whether or not the Village is the original polluter, the underlying complaints still seek to hold the Crestwood Defendants liable because they allegedly spread that pollution to thousands of people. Without the Village's actions, the pollution would have stayed only in the well and presumably not hurt anyone. Given the emphasis in the *Koloms* decision of the purpose of the pollution exclusion, it makes little sense to limit the pollution exclusion—long tail, widespread environmental liability—to only those instances where the insured is the original polluter.

Third, the Crestwood Defendants cite *West American Insurance Co. v. Tufco Flooring East, Inc.*, 409 S.E.2d 692 (N.C. 1991) for the proposition that the pollution exclusion should not extend to claims arising from the insured's "central business activity." There, asserting the pollution exclusion, the insurer denied coverage for a claim against a floor resurfacing company brought by one of its customers. *Id.* at 693-94. That customer alleged its chicken was tainted by exposure to chemicals used by the company to resurface the floor in the customer's chicken processing plant. *Id.* That court held "to allow [the insurer] to deny coverage for claims arising out of [the insured's] central business activity would render the policy virtually useless" and that the insurance company knew that the company's business was installing flooring. *Id.* at 697-98. *Tufco*'s holding is in tension with the opinion in *Kim*, which found that the "pollution exclusion applies to bar coverage, regardless of whether the [chemical at issue] was a waste product or whether it was legally and intentionally placed in the dry cleaning machine as part of the cleaning company's normal business activity." *Kim*, 728 N.E.2d at 535. Further, though *Koloms* discussed *Tufco* for the proposition that the purpose of the pollution exclusion is to exclude wide-ranging environmental liabilities, it did not adopt its "central business activity" construct for the pollution exclusion. *See Koloms*, 687 N.E.2d

14

at 81. In any event, *Tufco* is inapposite. The Crestwood Defendants do not assert that it is the Village's central business activity to work with the chemicals that allegedly contaminated the well.[6]

### B. The Counterclaim is Dismissed.

The Crestwood Defendants (except Saccia) have brought a counterclaim against the insurers, seeking declaratory judgment that they are owed a defense and indemnity under the policies at issue (Count I), that the Insurers breached the insurance policies at issue by not defending or indemnifying (Count II), and that the Insurers behaved "unreasonably and vexatiously" under Section 155 of the Illinois Insurance Code, entitling the Crestwood Defendants to attorneys' fees and other statutory penalties (Count III).

In Illinois the duty to defend an insured under a policy is broader than the duty to indemnify. *See McFatridge*, 604 F.3d at 338. Thus, because the pollution exclusion applies, the Insurers did not breach the insurance policies, as they had no duty to defend the Crestwood Defendants, nor the duty to indemnify them in the underlying suits. *See Health Care Ind. Liab. Ins. Prog. v. Momence Meadows Nursing Ctr.*, 566 F.3d 689, 693 (7th Cir. 2009) (noting that in Illinois, because the duty to defend is broader than the duty to indemnify, "a finding of no duty to defend necessarily precludes a finding of a duty to indemnify"); *Crum*, 620 N.E.2d at 1081 (same). Consequently, the Insurers are entitled to summary judgment on Count I and II of the Crestwood Defendants' counterclaim.

Section 155 of the Illinois Insurance Code provides, in part:

> In any action by or against a company wherein there is in issue the liability of a
> company on a policy or policies of insurance or the amount of the loss payable

---

[6] Given that the Court finds that the Insurers have no duty to defend because the pollution exclusion applies, the Court does not consider application of the "failure to supply" exclusion, which bars coverage for claims "arising out of the failure of any 'insured' to adequately supply . . . water."

15

> thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorneys fees . . . .

215 ILCS § 5/155. "The statute provides an extracontractual remedy to policyholders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." *Creamer v. Ins. Exchange Agency*, 675 N.E.2d 897, 900 (Ill. 1996). "An insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law. *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (internal citations omitted). Whether an insurer's conduct was vexatious and unreasonable is a question for the Court's determination, not a jury. *See Horning Wire Corp. v. Home. Indem. Co.*, 8 F.3d 587, 590 (7th Cir. 1993). Here, the Insurers asserted a legitimate policy defense, namely the pollution exclusion. They are entitled to summary judgment on Count III.

## IV. CONCLUSION.

For the foregoing reasons:

1. The Insurers's motion for summary judgment (Doc. 96) is granted, and the Insurers have no duty to defend the Crestwood Defendants the following cases identified in the Insurer's fifth amended complaint (Doc. 212) that are currently pending in the Circuit Court of Cook County, Illinois: 09 CH 16096 (*Marzano*), 09 CH 16356 (*Torrisi*), 09 CH 16391 (*Delarosa*), 09 CH 16516 (*Olatunde I*), 09 CH 16825 (*Olatude II*), 09 CH 16567 (*Rowan*), 09 CH 32969 (*Earley*), 09 L 7091 (*Barrera*), 09 L 11761 (*Wesolowksi*), 09 L 5746 (*Maan De Kok*), 10 L 4436 (*Alicia*), 09 CH

18361 (*Attorney General*), 09 L 14705 (*Lotz*), 09 L 15924 (*Arlen*), 10 L 3400 (*Dietterle*), 10 L 3699 (*Garibay*), 10 L 3602 (*Graham*), 10 L 4392 (*Fleming*), 10 L 4291 (*Gannon*), 10 L 4562 (*Alletto*), 10 L 4607 (*Jackowiak*), 10 L 4257 (*Nilsson*), 10 L 4530 (*Signore*), 10 L 4517 (*Sterba*), and 10 L 4217 (*Morsovillo*).

2. The Crestwood Defendants' motion for summary judgment (Doc. 100) is denied;

3. The Crestwood Defendants' fourth amended counterclaim (Doc. 228) is dismissed with prejudice.

4. The Court enters final judgment in accordance with Federal Rule of Civil Procedure 58 for the Insurers.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 24, 2011